# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

THE ESTATE OF B.I.C., et al., )
                                              )
                  Plaintiffs, )      **CIVIL ACTION**
                                                )
v.                                          )      No. 10-1017-MLB
                                                )
LINDA GILLEN, Individually and as )
an agent of the Kansas Social and )
Rehabilitation Services, )
                                                )
                  Defendant. )

---

## MEMORANDUM AND ORDER

Before the court are the following:

1. Defendant's amended motion for partial summary judgment on issue of qualified immunity and memorandum in support (Docs. 50, 51), plaintiffs' response (Doc. 54), and defendant's reply (Doc. 61).

## I.  COMPLAINT

Plaintiffs bring one danger creation claim on behalf of B.I.C. and two loss of familial association claims for Larry and Mary Crosetto and C.S.C. each pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment. Plaintiffs further allege a state law negligence claim citing to 28 U.S.C. § 1367.[1]

---

[1] Plaintiffs have not delineated which paragraphs in their complaint are relevant to each specific claim. It appears that paragraph 19 is relevant only to plaintiffs' state law claim as one cannot be liable under § 1983 for negligence. Paragraph 19 reads: The defendant was grossly negligent in failing to investigate the allegations surrounding the care and treatment of B.I.C. and in failing to remove B.I.C. from the home. The defendant voluntarily and affirmatively undertook to monitor the situation existing with B.I.C. and this action by an agent of SRS led other agencies which

Plaintiffs allege that defendant Linda Gillen individually and in her official capacity created the danger which resulted in B.I.C.'s death by failing to protect and prevent the continuous physical abuse of B.I.C. Defendant, claiming qualified immunity and other defenses, seeks summary judgment on plaintiffs' federal claims and discretionary declination of supplemental jurisdiction over their state claim.

## II.   SUMMARY JUDGMENT STANDARD

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. Adamson v. Multi Community Diversified Svcs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). If so, the court cannot grant summary

_____

could have protected B.I.C. to defer to the SRS. This undertaking was a specific duty owed by the defendant to B.I.C.

judgment.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

## III.  FACTS

Many of the facts are controverted, some unnecessarily, because the court views all controverted facts along with all favorable inferences in the light most favorable to plaintiffs.  <u>See</u> <u>Hall v. United Parcel Serv.</u>, No. Civ. A. 992467-CM, 2000 WL 1114841, at *5 (D. Kan. July 31, 2000) (citing <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670 (10th Cir. 1998)).  To the extent relevant, the factual disagreements between the parties will be noted.

Plaintiffs Larry and Mary Crosetto ("the Crosettos") are the grandparents of C.S.C., a minor.  B.I.C. was their granddaughter.  For the majority of 2006, B.I.C. lived with the Crosettos except weekends. In August 2006, B.I.C.'s mother left Randy Coons, B.I.C.'s father, and moved into the Crosettos' home.  B.I.C.'s mother died on August 9, 2007 and Coons removed B.I.C. from the Crosettos' home on August 18. B.I.C. continued to stay with the Crosettos on several weekends and at times when Coons did not have a babysitter.

In Fall 2007, the Crosettos began noticing bruising on B.I.C. That September, the Crosettos' babysitter, Allison Horner, observed that B.I.C. had a black eye, a busted lip with stitches and random bruising on her body.  Ms. Horner called SRS's child protection hotline and described B.I.C.'s injuries.  Ms. Horner provided B.I.C.'s name and birth date and told the hotline that B.I.C.'s father was Randy Coons and her brother was C.S.C.

On September 17, a Unified School District 445 ("USD 445") employee, Bev Mashburn, filled out a social work referral form for C.S.C.  (Doc. 54-5).  Ms. Mashburn detailed in her referral that Mr.

Crosetto described B.I.C. as always having bruises and recently had stitches in her lip. Ms. Mashburn also stated that Mr. Crosetto was trying to maintain an amicable relationship with Coons and while Mr. Crosetto was not trying to make unsubstantiated allegations, he wanted to make sure his grandchildren were living in a safe environment.

On October 7, Mr. Crosetto took B.I.C. to the hospital emergency room. However, the Crosettos did not contact SRS because they were in the process of creating a conservatorship for B.I.C. and C.S.C.

At around the same time, Mr. Crosetto called the fire department and inquired whether he could force a fire inspection. Fire Chief Greg Allen said that he would look into the matter. Chief Allen inspected the exterior of Coons' house and left a note requesting permission from Coons to inspect the inside. Neither Coons nor Melissa Wells, Coons' live-in girlfriend, responded to Chief Allen's request and apparently, Chief Allen let the matter drop.

On November 5, defendant responded to a Protection Report Center ("PRC")[2] report from USD 445 regarding a 2-inch by 2-inch red mark on the right side of C.S.C.'s face that required icing down. Wells admitted to getting upset with C.S.C. and slapping him across the face. Defendant investigated the report, but found any allegation of abuse to be unsubstantiated. Defendant met with Coons and Wells for approximately 45 minutes and implemented a safety plan.

On November 6, Mr. Crosetto called defendant but received no answer or returned phone call. Mr. Crosetto wanted to discuss his concerns regarding the bruising on C.S.C. and B.I.C. He also tried

_____

[2] Also referred to as the SRS hotline.

-4-

unsuccessfully to call defendant on November 14, 15, and 16.

On or around November 14, Coffeyville Police Department School Resource Officer Ed Rutherford investigated whether Coons and Wells were using drugs.

On November 20, Mr. Crosetto got in contact with defendant. He discussed the incident with C.S.C. Defendant stated that a case had been opened and that she had been to Coons' home to investigate.[3] Mr. Crosetto brought up B.I.C.'s bruising and that he suspected Wells was using drugs. Defendant responded that these allegations were "police matters and refused to discuss them." (Doc. 54 at 11).[4]

On December 10, Mr. Crosetto called defendant to discuss B.I.C.'s injuries because he believed that they were escalating. According to Mr. Crosetto, defendant stated that "her job was to preserve the family unit and not to investigate child abuse."[5] (Doc. 54 at 11). Mr. Crosetto scheduled an appointment with defendant to discuss her duties.

On December 12, Mr. Crosetto asked school officials for help but was told by USD 445 social worker Duane Powell that SRS was handling

---

[3] The parties disagree as to whether defendant falsely stated that she had been <u>in</u> the home. Defendant claims that she attempted to visit Wells' home, but was unsuccessful. It is uncontroverted that she did not go inside.

[4] Defendant controverts that Mr. Crosetto discussed B.I.C.'s bruising and that she told Mr. Crosetto that his concerns were police matters. Because the court resolves all disputed facts in favor of plaintiffs, the court assumes that these statements were made.

[5] Defendant controverts this statement of fact.

the situation.[6]

On December 23, the Crosettos were at church when their family physician, Allen Gillis, D.O., saw B.I.C.'s facial bruises. Dr. Gillis recommended that B.I.C. be examined. The next day, Mr. Crosetto took B.I.C. to Chan Han, M.D. for examination. Based upon his findings, Dr. Han called the police and sent a letter to the SRS office. Dr. Han requested SRS to investigate the situation and get back to him. However, Dr. Han received no response.

On December 24, while B.I.C. was being examined by Dr. Han, Officer Rutherford observed B.I.C. and spoke with Mr. Crosetto. Mr. Crosetto told Officer Rutherford that SRS had an open case on C.S.C. and B.I.C. and that SRS was having difficulty contacting Coons and Wells at their home. Officer Rutherford stated that he would be filing a Child in Need of Care case after contacting Montgomery County officials.

Officer Rutherford left a telephone message for defendant regarding the doctor visit to Dr. Han, but received no response. After Officer Rutherford completed his report, he sent it to SRS, the Juvenile County Attorney's office and the truancy officer. Officer Rutherford assumed that SRS would investigate and handle the matter after it received his report.

On December 28, the Crosettos went to their appointment with defendant. Mr. Crosetto tried to give defendant a CD of pictures

---

[6] Defendant argues in her motion to strike (Doc. 62) that Powell's statement is inadmissible hearsay pursuant to Fed. R. Civ. P. 56(c)(2) and should not be considered. Defendant is technically correct. However, see Fed. R. Evid. 102. The court will consider Powell's statement in support of plaintiffs' claim that they believed SRS was handling the situation with C.S.C. and B.I.C.

portraying B.I.C. injuries, but she refused to accept it and told Mr. Crosetto that the CD was a police matter. The meeting did not end amiably. The Crosettos believed that defendant had some animus against them and was not going to protect B.I.C. and C.S.C. until one of their grandchildren was killed. (Doc. 54 at 12).[7]

On January 17, 2008, the Coffeyville Police Department responded to a 911 call and found B.I.C. unresponsive in Wells' care. B.I.C. had head trauma and bruises on her body. She was hospitalized at the Coffeyville Regional Medical Center and then later flown to the St. Francis Medical Center in Tulsa, Oklahoma. There, doctors discovered "a brain bleed from a blow to the head and brain damage resulting from Shaken Baby Syndrome." (Doc. 1 at 4). On January 20, B.I.C. died from cerebral anoxia and cranial trauma caused by being shaken.

Following B.I.C.'s death, Director Camie Russell for the Abuse, Neglect and Exploitation Unit of the Kansas Attorney General's Office ("AG office") reviewed approximately 75 reports from the Montgomery County SRS office, 12 of which were assigned to defendant. During her investigation, Ms. Russell concluded that defendant failed to do several of her responsibilities when she reviewed the report concerning C.S.C. including: interview or observe other children living in the home, report to law enforcement that Wells admitted hitting C.S.C. across the face, interview additional material caretakers, and complete follow up on reports by law enforcement.

---

[7] Defendant controverts the plaintiffs' statement regarding the substance of the meeting. According to defendant, the meeting was to discuss grandparents rights and Mr. Crosetto thought defendant was "understanding." (Doc. 67 at 4). Again, because the court resolves all disputed facts in favor of plaintiffs, the court assumes that the statements were made.

(Doc. 54-11 at 4). Ms. Russell also determined that defendant handled
C.S.C. and B.I.C.'s case differently than the other 11 cases assigned
to her. Specifically, defendant was more "hands on" with her other
cases and "hands off" with Coons' children. (Doc. 54-2 at 3).

## IV. VIOLATION OF PLAINTIFFS' FOURTEENTH AMENDMENT RIGHTS

The court elects to determine whether plaintiffs' allegations,
if true, state a claim for a violation of a constitutional right. <u>See</u>
<u>Romero</u>, 45 F.3d at 1475 (relying in part upon <u>Siegert v. Gilley</u>, 500
U.S. 226, 231-32 (1991)). Determining whether a plaintiff has stated
a claim for a constitutional violation is purely a legal question.[8]
<u>See</u> <u>id.</u> Despite the inevitable factual issues that become intertwined
in the characterization of a plaintiff's precise constitutional
claims, this court cannot avoid the legal issue by simply framing it
as a factual question. <u>See</u> <u>Archer v. Sanchez</u>, 933 F.2d 1526, 1530 n.7
(10th Cir. 1991).

"The Due Process Clause of the Fourteenth Amendment provides that
'[n]o State shall ... deprive any person of life, liberty, or
property, without due process of law.'" <u>DeShaney v. Winnebago County</u>
<u>Dept. of Social Services</u>, 489 U.S. 189, 194-95, (1989). However, this
right does not require state actors to protect citizens from violence
by a private actor. <u>Id.</u> at 195.

In <u>DeShaney</u>, the United States Supreme Court stated that "[i]f
the Due Process Clause does not require the State to provide its
citizens with particular protective services, it follows that the

_____

[8] Similarly, whether the right was clearly established at the
time the incident occurred is also a legal question. <u>See</u> <u>Romero</u>, 45
F.3d at 1475 (relying in part upon <u>Siegert v. Gilley</u>, 500 U.S. 226,
231-32 (1991)).

State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." Id. at 196-197. The Court focused on the fact that the child was not in the State's custody.

> Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

DeShaney, 489 U.S. at 201.

The same is true here. B.I.C. was never in defendant's or the state's custody but instead remained in the custody of her father. However, the Tenth Circuit recognizes two exceptions to DeShaney's holding: (1) the special relationship doctrine[9] and (2) the danger creation theory. Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist., 511 F.3d 1114, 1126 (10th Cir. 2008). Plaintiffs claim that the danger creation exception applies.

<u>Danger Creation Claim</u>

Plaintiffs allege that defendant created the danger that lead to B.I.C.'s death. A state actor can be liable for acts of a third party

---

[9] "The special relationship doctrine comes into play when the state [has] assume[d] control over an individual sufficient to trigger an affirmative duty to provide protection to that individual...." Briggs v. Oklahoma ex rel. Oklahoma Dept. of Human Services, 472 F. Supp. 2d 1304, 1313 (W.D. Okla. 2007) (internal quotation marks omitted). Plaintiffs do not make a "special relationship" claim.

when she created the danger that caused the harm. <u>Briggs v. Johnson</u>, No. 07-6037, 2008 WL 1815721, *3 (10th Cir. Apr. 23, 2008). Tenth Circuit cases establish a six-part test which a plaintiff must meet to establish a danger creation claim:

> A danger creation claim must meet a six-part test: (1) the state entity and individual actors created the danger or increased the plaintiff's vulnerability to the danger; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious and known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, shocks the conscience. (Citations omitted). Regarding the necessary culpability, the Due Process clause only protects against "deliberately wrongful government decisions rather than merely negligent government conduct." <u>Uhlrig v. Harder</u>, 64 F.3d 567, 573 (10th Cir. 1995).

<u>Rost</u>, <u>supra</u>.

Plaintiffs must show that defendant's affirmative acts created or increased the danger to B.I.C. <u>See</u> <u>Currier v. Doran</u>, 242 F.3d 905, 919 (10th Cir. 2001) ("The danger creation theory ... focuses on the affirmative actions of the state in placing ... [an individual] in harm's way."). However, "[i]t is not enough under the danger creation theory to show that a state actor may have been aware of the danger with which an individual was confronted; a plaintiff must show that the state actor played a part in the creation of the danger or rendered that individual more vulnerable to the danger." <u>Briggs v. Oklahoma ex rel. Oklahoma Dept. of Human Services</u>, 472 F. Supp. 2d 1304, 1314 (W. D. Okla. 2007).

Although some cases discuss each factor of the test, another approach is to go directly to factor (6). <u>See</u> <u>Uhlrig v. Harder</u>, 64 F.3d 567, 572-76 (10th Cir. 1995). Therefore the court will consider

whether defendant's conduct is conscience shocking.

A.    Shock the Conscience

The "conscience shocking" factor is a key feature of a substantive due process claim and the Tenth Circuit has established three principles which are relevant in the court's evaluation of such claims: "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." Currier, 242 F.3d at 920. Defendant's "conduct must be 'viewed in total,' and thus the cumulative impression of [defendant's] conduct should be considered." Id.

The parties have given little, if any, attention to these principles in their submissions. The "restraint" principle means that federal courts must be parsimonious when analyzing a set of facts alleged to demonstrate a substantive due process violation. The second principle is self-explanatory. Here, plaintiffs have made a negligence claim under Kansas law which can be resolved in state court. There is no evidence in the record relating to the third principle. Kansas has several statutes and regulations pertaining to the duties of the Secretary of the Department of Social and Rehabilitation Services insofar as they pertain to children. See, e.g., KSA 39-708(r), the Revised Code for Care of Children, KSA 38-2201, 2202 and 2223 and KAR 30-46-10. However, the court cannot identify in the statutes and regulations any language which deals with local policy decisions impacting public safety to which this court must give deference.

To shock the conscience of federal judges requires a high level

of outrageousness.  <u>Ruiz v. McDonnell</u>, 299 F.3d 1173, 1183 (10th Cir. 2002).    The court observed in <u>Uhlrig v. Harder</u>, 64 F.3d 567, 574 (10th Cir. 1995):

> the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. The level of conduct required to satisfy this additional requirement cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct. We do know, however, that the "shock the conscience" standard requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort and that merely allowing unreasonable risks to persist ... is not necessarily conscience shocking.

(Citing <u>Collins v. City of Harker Heights Tex.</u>, 503 U.S. 115, 128 (1992)).   Even permitting unreasonable risks to continue is not necessarily conscience shocking. <u>Ruiz</u>, 299 F.3d at 1184 (internal citations and quotations omitted.)  A state defendant's actions must be deliberate:  "This deliberateness requirement can be satisfied by demonstrating 'an intent to place a person unreasonably at risk,' which has been defined as when a state actor 'was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious disregard and unreasonable disregard of the consequences.'" <u>Kuyper v. Board of County Commissioners of Weld County, Colo.</u>, No. 09-cv-00342-PAB-MEH, 2010 WL 1287534, *8 (D. Colo. Mar. 30, 2010).

The parties have not spent a lot of time on the conscience shocking factor.  Cases involving police scenarios are not especially helpful.  <u>See</u>, <u>e.g.</u>, <u>Radecki v. Barela</u>, 146 F.3d 1227 (10th Cir. 1998).   Instead, the court has reviewed at least some of the Tenth Circuit cases which involve actions of a social worker in an effort

to find guidance about conduct considered to be conscience shocking.

In <u>Currier v. Doran</u>, the abused children were in the custody of the state after being removed from their mother's home. The defendant social workers were considering the child's father for placement. Social worker Doran was aware of the father's history of financial irresponsibility and that the father said he would have difficulties taking care of the children due to his work schedule. When it came time to go before the court to consider the father for placement, social worker Doran did not tell the court about father's missed child support payments or his work schedule.

The court placed the children with their father. Afterwards, social worker Doran noticed bruising on one child's cheek during visits. The children's mother told social worker Doran that the father and his girlfriend were abusing the children. Social worker Doran determined that abuse was in the home and removed the children, but the children were later returned to father's home based on a supervisor's orders.

There were other signs of abuse. The children had bite marks. The father admitted to biting one of the children when he claimed they were wrestling but the little girl said that the children were bitten as a form of punishment. She also told a different social worker that she was spanked with a belt.

A guardian <u>ad</u> <u>litem</u> made a report that children would be subject to further abuse if they remained in the home. The children's mother also made reports of abuse, but was instructed by the social worker to quit making such reports because it was traumatizing the children.

The Tenth Circuit found that social worker Doran's conduct <u>could</u>

<u>be</u> conscience shocking:

> In light of the initial information Doran had about
> Vargas' financial irresponsibility, and in light of the
> numerous bruises and allegations of abuse, Doran's failure
> to investigate the bruises and allegations and his
> subsequent responsibility for the court order granting
> Vargas legal custody could be conscience shocking,
> depending, of course, on further context as provided by
> discovery.

<u>Id.</u> at 920.[10]

In <u>Briggs v. Johnson</u>, No. 07-6037, 2008 WL 1815721, (10th Cir. Apr. 23, 2008) the defendant social worker investigated a report of child abuse by the child's mother and placed the child in custody of the state. The child's paternal grandmother was appointed to act as the child's guardian. After some time, the social worker approved unsupervised visits by the mother but there was evidence that the mother was again abusing child. The abuse continued over the course of the unsupervised visits with the mother.

The Tenth Circuit found that the complaint alleged sufficient facts such that the defendant agency and social worker's conduct in discouraging reports of abuse and failing to investigate evidence of abuse <u>could</u> <u>be</u> conscience shocking after the facts were fully developed. 2008 WL 1815721 at 5. The Circuit found that no reasoned justification or policy consideration supported such conduct. <u>Id.</u>

In <u>Kuyper v. Board of County Commissioners of Weld County, Colo.</u>, <u>supra</u>, the plaintiffs served as foster parents and were concerned with fostering male children. Specifically, plaintiffs did not want a male foster child with a history of sexual misconduct. The defendant

---

[10]Defendants initially filed motions for summary judgment but, for the reasons explained in the Tenth Circuit's opinion (242 F.3d at 911), the district court converted them to motions to dismiss.

social workers were responsible for sharing special needs and behavioral history with potential foster parents. The social workers were aware that plaintiffs had three young girls in their home and assured plaintiffs that I.G. had no history of sexual misconduct. Approximately nine days later, after plaintiffs had fostered I.G., one of their daughters claimed that I.G. had sexually abused her. Plaintiffs later learned that I.G. did have a history of sexual misconduct.

The district court denied a motion to dismiss because the complaint alleged that "the [defendants] affirmatively lied to the [plaintiffs] in order to ease the placement of a child with a history of sexual misconduct in the plaintiffs' home." Id. at 9. The court found that this affirmative conduct could be conscience shocking after development of the facts.

Perhaps the most which can be taken away from these cases is that a social worker's conduct, even conduct as disturbing as that in Currier v. Doran, can be conscience shocking, depending on all the facts. Here, presumably all the facts have been developed. Some facts are disputed but there is no claim that additional factual development is needed.

So, what sort of conduct has been found not to meet the conscience shocking test? In Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008), an eight month-old girl died from injuries suffered at her daycare. Prior to placing the girl at this daycare, the defendant social workers told plaintiffs that the daycare was their only option due to their finances and need for subsidized care. Id. at 1246.

The court held that there was no danger creation claim on the

basis that the social workers failed to revoke the daycare's license. Likewise, plaintiffs failed to allege sufficient facts that the social workers acted affirmatively in any manner to give plaintiffs the impression that the daycare was a safe place for their daughter. <u>Id.</u> at 1251-52.

In <u>Ruiz v. McDonald</u>, <u>supra</u>, the Tenth Circuit affirmed the dismissal of a complaint. A child died as a result of abuse at a daycare. The defendant social worker failed to conduct a background and insurance check on the daycare and its owners. The Circuit distinguished <u>Ruiz</u> from <u>Currier</u> and noted that failing to conduct an investigation, even though the omission was negligent, was not conscience shocking. 299 F.3d at 1185.[11]

In <u>Pierce v. Delta County Dept. of Social Services</u>, 119 F. Supp. 2d 1139, 1152 (D. Colo. 2000), the defendant agency received numerous reports that the children were being abused by their mother's live-in boyfriend. The agency assigned a social worker to investigate who determined that reports were unfounded and believed the situation to be nothing more than a custody dispute.

The district court found, after viewing the facts in favor of

---

[11] Referring to <u>Currier</u>, the court states: "We held that the plaintiffs had alleged facts sufficient to show that the social worker's conduct "shocked the conscience." <u>Id.</u> at 920." This might be a misstatement. The quote at page 920 of <u>Currier</u>, in pertinent part, is: ". . . Doran's failure to investigate . . . could be conscience shocking, depending, of course, on further context as provided by discovery." <u>Currier</u> was affirmed, in part and reversed, in part and there are no reported later opinions which shed light on whether Doran's conduct ultimately was found, as a matter of law, to be conscience shocking.

plaintiffs, that they had not sufficiently alleged a danger creation claim because the social worker simply failed to investigate reports of child abuse and did not affirmatively place the children in their abusive situation or increase the danger in any way. Id. ("[T]he state actors did not disturb the status quo by removing the children and then placing them in an abusive environment, or removing the children from an abusive environment and then returning them to that environment, but, rather, simply failed to remove the children from the abuser in the first place, courts have been reluctant to accept the danger-creation theory as a means of circumventing DeShaney.").

The common denominator of the danger creation/shock the conscience cases involving social workers appears to be affirmative, deliberate, outrageous conduct coupled with unreasonable disregard to the consequences of the conduct. Merely failing to investigate reports of abuse and/or to remove a child from an abusive home is not conscience shocking, let alone a constitutional violation under Tenth Circuit case law. On the other hand, when a social worker or agency discourages reports of abuse, or fails to tell someone about a history of abuse or financial irresponsibility, these affirmative acts, coupled with knowledge of abuse "could be" sufficient to meet the conscience shocking standard, at least on a motion to dismiss.

In the present case, finding all disputed facts in favor of plaintiffs,[12] there is evidence of the following facts:

- Defendant knew of Wells' history of abuse of her own son.

_____

[12] It is disputed whether defendant actually knew of Wells' history of abuse and allegations of abuse. It is also disputed whether defendant received the Officer Rutherford's and Dr. Han's reports.

-17-

- Ms. Horner called the SRS hotline and reported injuries to B.I.C.'s face in fall 2007.
- There were allegations of drug use by Wells.
- USD 445 officials, Officer Rutherford and Dr. Han sent reports to the Coffeyville SRS office detailing their suspicions of abuse to C.S.C. and B.I.C.
- Wells admitted to striking C.S.C. across the face in anger which left an mark that required ice.
- Officer Rutherford left a message for defendant personally to return his call.
- Mr. Crosetto had several conversations with defendant informing her of the abuse and stating that he had pictures of B.I.C.'s injuries.
- Defendant told Mr. Crosetto that her responsibility was to preserve the family unit as opposed to investigating reports of child abuse.
- Defendant refused to accept photographs of B.I.C.'s injuries and told Mr. Crosetto that they were a police matter subsequent to Officer Rutherford mailing his report to her office.
- Ms. Russell's determined that defendant handled the Coons children's case differently than she handled her other cases.
- Ms. Russell concluded through her investigation that defendant failed to do the following:[13]

---

[13] Ms. Russell does not state specifically that defendant violated any statute or agency policy.

- note the history of prior SRS involvement with alleged perpetrator when she was assigned the report for investigation.

- update face sheet CFS 1000 to include other children in the home or complete Section I or II of Risk Assessment(short form) 2030C during the course the investigation.

- take photos of the child to document the injury.

- interview or observe the other children living in the home at the time.

- request or complete a home visit; the site where the alleged abuse occurred.

- report to law enforcement at time of assignment for investigation.

- report to law enforcement when Wells confessed to intentionally hitting 5 year old child in the face.

- initiate interviews of additional significant caretakers during the course of the investigation.

- acknowledge or address additional concerns provided by Mr. Crosetto through his multiple contacts with defendant directly.

- complete follow up on reports by law enforcement.

- follow up or update the safety plan for the family.

(Doc. 54-11 at 4).

Even if some of these facts are not ultimately proved or are explained away, defendant's cumulative conduct is hard to explain or justify. The overall impression is of a social worker who, for whatever reason, failed to do her job, with tragic consequences. But it is just this overall impression which dooms plaintiffs' danger creation claim. To be actionable, defendant's overall conduct must be decidedly affirmative and when the aforesaid facts are considered, whether separately or individually, little affirmative conduct appears. Rather, defendant basically did nothing in the face of evidence that would cause any thinking person, not merely someone supposedly trained, to recognize that B.I.C. and C.S.C. were in peril. Sadly, this is a common feature of the cited cases involving social workers who inexplicably fail in their responsibilities to children. And each case, just like this case, presents facts which are both tragic and avoidable. But bad as they are, they do not demonstrate conduct which can be deemed to "shock the conscience" under precedent to which this court must adhere.

Accordingly, defendant's motion for summary judgment is sustained insofar as plaintiffs' danger creation claim regarding B.I.C. is concerned.

<u>Familial Association Claims</u>

Disposition of the danger creation claim does not automatically compel summary judgment on the familial association claims. As the court observed in <u>Dubbs v. Head Start, Inc.</u>, 336 F.3d 1194, 1203 (10th Cir. 2003):

> While the "shocks the conscience" standard applies to tortious conduct challenged under the Fourteenth Amendment, <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 848-51, 118 S.

Ct. 1708, 140 L. Ed. 2d 1043 (1998), it does not exhaust the category of protections under the Supreme Court's substantive due process jurisprudence, or eliminate more categorical protection for "fundamental rights" as defined by the tradition and experience of the nation.

A plaintiff states a valid substantive due process claim under the Fourteenth Amendment by satisfying either the shocks the conscience or the fundamental right standards. Substantive due process cases should be examined under both standards. The court is satisfied that its discussion of the danger creation claim on behalf of B.I.C. applies generally to the familial association claims because if defendant's conduct did not violate B.I.C.'s Fourteenth Amendment right to life, then it could not be conscience shocking behavior which would violate the grandparents' and sibling's right of familial association, which is based on the Fourteenth Amendment's concept of liberty. Griffin v. Strong, 983 F.2d 1544, 1547 (1993). It would be hard to argue that the right to liberty is greater than the right to life.

The Tenth Circuit has outlined the analysis which must be taken under the so-called "fundamental rights strand" of the substantive due process doctrine.

We undertake the fundamental rights analysis in two steps. First, we must "careful[ly] descri[be] ... the asserted fundamental liberty interest." Glucksberg, 521 U.S. at 721, 117 S. Ct. 2302 (internal quotation omitted)[14]; see also Chavez, 538 U.S. at 775-76, 123 S. Ct. 1994 (noting plaintiff must put forth "a 'careful description' of the asserted fundamental liberty interest for the purposes of substantive due process analysis; vague generalities ... will not suffice."). Second, we must decide whether the asserted liberty interest, once described, is "objectively, deeply rooted in this Nation's history and tradition, and

_____

[14] Washington v. Glucksberg, 521 U.S. 702 (1997).

> implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Id. (internal quotations omitted) ...

Seegmiller v. LaVerkin City, 528 F.3d 762, 769 (10th Cir. 2008).

Seegmiller notes that the court has recognized fundamental liberty interests to consist of those relating to family life, among others. Id. at 770; see also Starkey ex rel. A.B. v. Boulder County Social Services, 569 F.3d 1244, 1253 (10th Cir. 2009) ("'[The] right of familial association [of plaintiffs, a mother and child,] is included in the substantive due process right of freedom of intimate association[.]'")

The court is satisfied that the Tenth Circuit would recognize loss of familial association claims of grandparents and siblings of one who is deceased as falling within the category of a fundamental liberty interest. See, generally, Suasnavas v. Stover, No. 05-5171, 2006 WL 2458678, *9 (10th Cir. Aug. 25, 2006) and cases cited therein.[15] That is not to say, however, that plaintiffs' claims in this case can survive summary judgment.

The familial association claims in plaintiffs' complaint are:

> 17. The defendant acted with malice and an animus toward the Crosettos that resulted in the death of B.I.C. The defendant apparently held a grudge against the Crosettos based upon actions they had taken years prior involving the adoption of their daughter Angela. Plaintiffs believe that the defendant failed to act to protect their grandchildren because of this pre-existing grudge.
>
> 18. The defendant intentionally interfered with the

---

[15] These cases dispose of defendant's barely-asserted qualified immunity defense. Defendant has cited no authority stating or even suggesting that grandparents or siblings' liberty interest rights were not clearly established prior to 2007.

> plaintiffs' familial relationship with the decedent. As a result of the defendant's conduct, they lost their constitutional rights of familial association with B.I.C.

In their response to defendant's motion, plaintiffs have attached an affidavit of Larry Crosetto expressing his opinion that defendant "hated" him and his wife because of an adoption dispute which occurred in the mid-1980s and because defendant attempted, unsuccessfully, to place C.S.C. in a foster home <u>after</u> B.I.C.'s death. Plaintiffs also have attached the affidavit of Camie Russell, the author of the Attorney General's report, <u>supra</u>, who opines that her explanation for defendant's conduct is "... that she had some animus or ill will toward the Crosettos and elected to do nothing to protect the children." (Doc. 54-2 at 3-4).

The Tenth Circuit requires more than mere statements or acts by a defendant to satisfy a plaintiffs' burden to show a substantive due process violation. Instead, the Tenth Circuit requires a balancing of liberty interest against the relevant state interest. <u>Griffin v. Strong</u>, <u>supra</u> at 1547. The state has important generalized interests in investigating cases of alleged child abuse, about which there can be no dispute. Balanced against this interest is the family members' right of association, which also is substantial. Finally the Tenth Circuit looks "... to the facts surrounding the parties' interests. Not every statement or act that results in an interference with the rights of intimate association is actionable. Rather to rise to the level of a constitutional claim, the defendant must <u>direct</u> his or her statements or conduct at the intimate relationship with knowledge that the statement or conduct will adversely affect that relationship.

<u>Trujillo</u>, 768 F.2d at 1190.[16]"   <u>Id.</u> at 1548.

In this case, there is no evidence that defendant's statements or conduct during B.I.C.'s life imposed any undue burden to the Crosettos' or C.S.C's rights to associate with B.I.C.  Defendant did not remove B.I.C. from the Crosettos' or father's home, or otherwise take action to restrict their access to B.I.C., thus preventing or interfering with their relationships with B.I.C.  On the contrary, as previously discussed at some length, plaintiffs' claims are premised on defendant's failure to act, e.g. to prevent abuse by Coons and/or Wells.  <u>See</u> <u>PJ ex rel. Jensen v. Wagner</u>, 603 F.3d 1182, 1199 (10th Cir. 2010).  The court acknowledges plaintiffs' assertion that defendant's conduct was motivated by her "hatred" of the Crosettos, but there is no evidence or reasonable inference that her "hatred" was directed at their relationship with B.I.C. with defendant's knowledge that her statements or conduct would adversely affect the relationship so as to result in B.I.C.'s death.  Stated more succinctly, there is no evidence that defendant wanted B.I.C. to die to satisfy her alleged hatred of the Crosettos. As already observed, the facts of this case, at least as presented in the motion papers, would appear to be sufficient to get the case to a state court jury on plaintiffs' negligence claims.  Keeping in mind the general need for restraint, they are not sufficient, however, to make out a jury case of a violation of plaintiffs' substantive due process right to familial association and summary judgment is granted on that claim.

---

[16] <u>Trujillo v. Board of County Commissioners</u>, 768 F.2d 1186 (10th Cir. 1985).

<u>Supplemental Jurisdiction</u>

The court has disposed of all of plaintiffs' federal claims. "The exercise of supplemental jurisdiction is therefore discretionary." <u>Woodberry v. Bruce</u>, No. 04-3100, 2004 WL 2106558, *2 (10th Cir. Sept. 22, 2004).

The court declines to exercise supplemental jurisdiction over plaintiffs' remaining state negligence claim. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction[.]"). Plaintiffs' state claim is dismissed, without prejudice. Defendant's motion to strike (Doc. 62) is moot.

**V.   CONCLUSION**

Defendant's amended motion for summary judgment (Doc. 50) is granted.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in <u>Comeau</u>

v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

        IT IS SO ORDERED.

        Dated this  7th  day of July 2011, at Wichita, Kansas.

                                        s/ Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE