**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

THE ESTATE OF B.I.C., a Minor            )
Child, Deceased, LARRY F. CROSETTO,)
Individually and as Next Friend of )
C.S.C., a Minor Child, and MARY    )
LOU CROSETTO,                      )
                       Plaintiffs,    )    **CIVIL ACTION**
                                      )
v.                                 )    No. 10-1017-MLB
                                      )
LINDA GILLEN, Individually and as  )
an agent of the Kansas Social and  )
Rehabilitation Services,           )
                                      )
                       Defendant.     )
_____    )

**MEMORANDUM AND ORDER**

Before the court is defendant's supplemental motion for summary judgment (Doc. 85). The motion has been fully briefed and is ripe for decision. (Docs. 87, 88). For the reasons stated more fully herein, defendant's motion is granted.

**I.    Facts and Procedural History**[1]

Plaintiffs Larry and Mary Crosetto ("the Crosettos") are the grandparents of Brook[2] and C.S.C., both minors. For the majority of 2006, Brook lived with the Crosettos during the week. In August 2006, Brook's mother Angela left Randy Coons, Brook's father, and moved into the Crosettos' home. Angela died on August 9, 2007, and Coons removed Brook from the Crosettos' home on August 18. Brook continued to stay

---

[1] The uncontroverted facts are largely taken from this court's prior order, which were not challenged on appeal, (Doc. 73) and the Tenth Circuit's decision in this case, Estate of B.I.C. v. Gillen, 710 F.3d 1168 (10th Cir. 2013).

[2] Brook is also known as B.I.C.

with the Crosettos on several weekends and at times when Coons did not have a babysitter. Coons lived with his girlfriend, Melissa Wells, who has since been found guilty of Brook's murder and claims to have been suffering from a methamphetamine addiction at the time.

Defendant Linda Gillen has been a social worker with the Kansas Department of Social and Rehabilitative Services ("SRS") in Coffeyville, Kansas for the past several decades. The Crosettos claim that defendant had intense hatred for their family, stemming from events that occurred during their adoption of Angela in 1982. The Crosettos also claim that defendant knew about Melissa Wells and her background because she had been in the custody of SRS as a child.

In Fall 2007, the Crosettos began noticing bruising on Brook. That September, the Crosettos' babysitter, Allison Horner, observed that Brook had a black eye, a busted lip with stitches and random bruising on her body. Ms. Horner called SRS's child protection hotline and described Brook's injuries. Ms. Horner provided Brook's name and birth date and told the hotline that Brook's father was Randy Coons and her brother was C.S.C.

On September 17, a Unified School District 445 ("USD 445") employee, Bev Mashburn, filled out a social work referral form for C.S.C. Ms. Mashburn detailed in her referral that Mr. Crosetto described Brook as always having bruises and recently had stitches in her lip. Ms. Mashburn also stated that Mr. Crosetto was trying to maintain an amicable relationship with Coons and while Mr. Crosetto was not trying to make unsubstantiated allegations, he wanted to make sure his grandchildren were living in a safe environment.

On October 7, Mr. Crosetto took Brook to the hospital emergency

room. However, the Crosettos did not contact SRS because they were in the process of creating a conservatorship for Brook and C.S.C.

At around the same time, Mr. Crosetto called the fire department and inquired whether he could force a fire inspection. Fire Chief Greg Allen said that he would look into the matter. Chief Allen inspected the exterior of Coons' house and left a note requesting permission from Coons to inspect the inside. Neither Coons nor Wells responded to Chief Allen's request and apparently, Chief Allen let the matter drop.

On November 5, defendant responded to a Protection Report Center ("PRC")[3] report from USD 445 regarding a 2-inch by 2-inch red mark on the right side of C.S.C.'s face that required icing down. Wells admitted to getting upset with C.S.C. and slapping him across the face. Defendant investigated the report, but found any allegation of abuse to be unsubstantiated. Defendant met with Coons and Wells for approximately 45 minutes and implemented a safety plan.

On November 6, Mr. Crosetto called defendant but received no answer or returned phone call. Mr. Crosetto wanted to discuss his concerns regarding the bruising on C.S.C. and Brook He also tried unsuccessfully to call defendant on November 14, 15, and 16.

On or around November 14, Coffeyville Police Department School Resource Officer Ed Rutherford investigated whether Coons and Wells were using drugs.

On November 20, Mr. Crosetto got in contact with defendant. He discussed the incident with C.S.C. Defendant stated that a case had

---

[3] Also referred to as the SRS hotline.

been opened and that she had been to Coons' home to investigate.[4]  Mr. Crosetto brought up Brook's bruising and that he suspected Wells was using drugs.  Defendant responded that these allegations were "police matters and refused to discuss them."  (Doc. 54 at 11).[5]

On December 10, Mr. Crosetto called defendant to discuss Brook's injuries because he believed that they were escalating.  According to Mr. Crosetto, defendant stated that "her job was to preserve the family unit and not to investigate child abuse."[6]  (Doc. 54 at 11). Mr. Crosetto scheduled an appointment with defendant to discuss her duties.

On December 12, Mr. Crosetto asked school officials for help but was told by USD 445 social worker Duane Powell that SRS was handling the situation.

On December 23, the Crosettos were at church when their family physician, Allen Gillis, D.O., saw Brook's facial bruises.  Dr. Gillis recommended that Brook be examined.  The next day, Mr. Crosetto took Brook to Chan Han, M.D. for examination.  Based upon his findings, Dr. Han called the police and sent a letter to the SRS office.  Dr. Han requested SRS to investigate the situation and get back to him. However, Dr. Han received no response.

---

[4] The parties disagree as to whether defendant falsely stated that she had been in the home.  Defendant claims that she attempted to visit Wells' home, but was unsuccessful.  It is uncontroverted that she did not go inside.

[5] Defendant controverts that Mr. Crosetto discussed Brook's bruising and that she told Mr. Crosetto that his concerns were police matters.  Because the court resolves all disputed facts in favor of plaintiffs, the court assumes that these statements were made.

[6] Defendant controverts this statement of fact.

On December 24, while Brook was being examined by Dr. Han, Officer Rutherford observed Brook and spoke with Mr. Crosetto. Mr. Crosetto told Officer Rutherford that SRS had an open case on C.S.C. and Brook and that SRS was having difficulty contacting Coons and Wells at their home. Officer Rutherford stated that he would be filing a Child in Need of Care case after contacting Montgomery County officials.

Officer Rutherford left a telephone message for defendant regarding the doctor visit to Dr. Han, but received no response. After Officer Rutherford completed his report, he sent it to SRS, the Juvenile County Attorney's office and the truancy officer. Officer Rutherford assumed that SRS would investigate and handle the matter after it received his report.

On December 28, the Crosettos went to their appointment with defendant. Mr. Crosetto tried to give defendant a CD of pictures portraying Brook injuries, but she refused to accept it and told Mr. Crosetto that the CD was a police matter. The meeting did not end amicably. The Crosettos believed that defendant had some animus against them and was not going to protect Brook and C.S.C. until one of their grandchildren was killed.

On January 17, 2008, the Coffeyville Police Department responded to a 911 call and found Brook unresponsive in Wells' care. Brook had head trauma and bruises on her body. She was hospitalized at the Coffeyville Regional Medical Center and then later flown to the St. Francis Medical Center in Tulsa, Oklahoma. There, doctors discovered "a brain bleed from a blow to the head and brain damage resulting from Shaken Baby Syndrome." (Doc. 1 at 4). On January 20, Brook died from

cerebral anoxia and cranial trauma caused by being shaken.

Following Brook's death, Director Camie Russell for the Abuse, Neglect and Exploitation Unit of the Kansas Attorney General's Office ("AG office") reviewed approximately 75 reports from the Montgomery County SRS office, 12 of which were assigned to defendant. During her investigation, Ms. Russell concluded that defendant failed to do several of her responsibilities when she reviewed the report concerning C.S.C. including: interview or observe other children living in the home, report to law enforcement that Wells admitted hitting C.S.C. across the face, interview additional material caretakers, and complete follow up on reports by law enforcement. Ms. Russell also determined that defendant handled C.S.C. and Brook's case differently than the other 11 cases assigned to her. Specifically, defendant was more "hands on" with her other cases and "hands off" with Coons' children. (Doc. 54-2 at 3).

This case initially was before this court when defendant filed a motion to dismiss on qualified immunity. The motion was denied by Memorandum and Order of May 28, 2010. (Doc. 20). Discovery limited to qualified immunity proceeded.

On July 7, 2011, this court entered an order granting defendant summary judgment on the Crosettos' claims of danger creation and familial association. (Doc. 73). The Crosettos appealed. The Circuit filed a published opinion on December 19, 2012 which, after rehearing, was withdrawn and replaced by another published opinion filed on March 19, 2013. The Circuit affirmed this court's decision on the familial association claim but reversed the decision on the danger creation claim. The Circuit held that "[v]iewed in the light

most favorable to the Plaintiffs, Ms. Gillen's refusal to accept evidence from the Crosettos that BIC was being abused and her refusal to help BIC based on her alleged longstanding hatred of the Crosettos is sufficient for Plaintiffs to withstand summary judgment on the shocks-the-conscience element." Gillen, 710 F.3d at 1173. The Circuit remanded the case with instructions. The court is to determine whether defendant's conduct was affirmative, whether there is a dispute of material fact as to the remaining five elements of the Crosettos' danger creation claim and, in the event the court finds a danger creation violation, whether the right was clearly established. Gillen, 710 F.3d at 1174-75.

**II. Summary Judgment Standard**

The parties are familiar with the standards pertaining to summary judgment. This time around, the parties have simply supplemented their earlier motions without additional facts. The parties correctly recognize that whatever may be few disputed facts at this time, they are not material to resolution of the issues specified in the Circuit's decision.

**III. Analysis**

"The Due Process Clause of the Fourteenth Amendment provides that '[n]o State shall ... deprive any person of life, liberty, or property, without due process of law.'" DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 194-95, (1989). However, this right does not require state actors to protect citizens from violence by a private actor. Id. at 195.

In DeShaney, the United States Supreme Court stated that "[i]f the Due Process Clause does not require the State to provide its

citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." Id. at 196-197. The Court focused on the fact that the child was not in the State's custody.

> Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

DeShaney, 489 U.S. at 201.

The same is true here. Brook was never in defendant's or the state's custody but instead remained in the custody of her father. However, the Tenth Circuit recognizes two exceptions to DeShaney's holding: (1) the special relationship doctrine[7] and (2) the danger creation theory. Gillen, 710 F.3d at 1173. The Crosettos claim that the danger creation exception applies.

### Danger Creation Claim

The Crosettos allege that defendant increased the danger that

---

[7] "The special relationship doctrine comes into play when the state [has] assume[d] control over an individual sufficient to trigger an affirmative duty to provide protection to that individual...." Briggs v. Oklahoma ex rel. Oklahoma Dept. of Human Services, 472 F. Supp. 2d 1304, 1313 (W.D. Okla. 2007) (internal quotation marks omitted). The Crosettos do not make a "special relationship" claim.

-8-

lead to Brook's death. A state actor can be liable for acts of a third party when she created or increased the danger that caused the harm. Id.

The danger creation theory requires the Crosettos to first establish affirmative conduct by defendant which increased the danger to Brook Id.; see Currier v. Doran, 242 F.3d 905, 919 (10th Cir. 2001) ("The danger creation theory ... focuses on the affirmative actions of the state in placing ... [an individual] in harm's way."). However, "[i]t is not enough under the danger creation theory to show that a state actor may have been aware of the danger with which an individual was confronted; a plaintiff must show that the state actor played a part in the creation of the danger or rendered that individual more vulnerable to the danger." Briggs v. Oklahoma ex rel. Oklahoma Dept. of Human Services, 472 F. Supp. 2d 1304, 1314 (W. D. Okla. 2007).

### A. Affirmative Acts

In discussing affirmative acts with respect to this case, the Circuit stated as follows:

> As an initial matter, a showing of affirmative conduct and private violence are preconditions necessary to invoking the state-created danger theory. Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 920 n. 8 (10th Cir. 2012). Here there is no question whether BIC's death was caused by an act of violence by a private party. There is, however, a question as to whether there is sufficiently "affirmative conduct on the part of the state in placing the plaintiff in danger." Id. at 916 (quotation and emphasis omitted). Our precedents consistently conclude that mere negligence or inaction is not enough. In particular, a social worker who fails to act may be negligent but does not forfeit immunity when there is no affirmative action. See, e.g., Robbins v. Oklahoma, 519 F.3d 1242, 1251–52 (10th Cir. 2008) (social worker not liable for failure to revoke a daycare's license where no there was no affirmative act creating an

-9-

>     impression that the daycare would be safe); Ruiz v.
>     McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002) (social
>     worker not liable for failing to conduct a background
>     check of a childcare facility where no alleged
>     affirmative conduct).

Gillen, 710 F.3d at 1173.

In Robbins, the Tenth Circuit explained that a state actor has no affirmative obligation to protect citizens against private actors unless an affirmative act by the state actor incurs a "duty to protect." 519 F.3d at 1251. The Crosettos identify the following five acts which they assert are affirmative conduct by defendant:

> (1) refusing to return police phone calls; (2) refusing to accept a CD of photographs showing injuries to BIC and her brother; (3) lying about being in the Coon's home; (4) telling the Crosettos the abuse of BIC and her brother was not her issue but one for law enforcement; and (5) claiming that allegations of abuse by Ms. Wells were unsubstantiated.

(Doc. 87 at 8).[8]

Turning to the first act, Officer Rutherford made one phone call to defendant which was not returned. Defendant contends that this was merely a failure to act and not an affirmative act. As the Tenth Circuit has held, "it is important to distinguish between affirmative conduct that creates or enhances a danger and a failure to act that merely does not decrease or eliminate a pre-existing danger. This distinction, while subtle, is critical under DeShaney and its progeny." Gonzales v. City of Castle Rock, 307 F.3d 1258, 1263 (10th

---

[8] The Crosettos initially argue that this court's order denying defendant's motion to dismiss is dispositive on the issue of affirmative action. The court disagrees. The standard for a motion for summary judgment is different than for a motion to dismiss. In any event, the court is not bound by its earlier decision and may reconsider its findings at any time. Indeed, in light of the Circuit's remand, it must reconsider.

Cir. 2002) (overruled by Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748 (2005) on procedural due process issue).  The Crosettos do not cite any authority to support their position that defendant's failure to return Officer Rutherford's call was an affirmative act. A failure to return a phone call, even if intentional, is not an affirmative act.  See Robbins, 519 F.3d at 1251.

Next, the Crosettos contend that defendant refused to listen to their allegations of abuse and told them that the matter was for police.  The Crosettos argue that defendant's refusal to accept the CD and defendant's statement that the physical abuse of Brook was a police matter were affirmative acts.  The failure to accept evidence of abuse or investigate allegations of abuse are not affirmative acts because a refusal to act cannot be said to equate with the state undertaking a duty to protect Brook  See id.

The Crosettos persist, however, that the refusals are equivalent to the social worker's actions in Currier.  In Currier, the state of New Mexico removed two young children from the custody of their mother, Devonne Juarez, and placed them in the custody of their father, Christopher Vargas.  Vargas's physical abuse of the children led to the death of one child. Representatives of the children filed suit alleging that defendant Medina, a social worker, violated the children's substantive due process rights when she instructed Juarez "to stop making allegations of abuse."  242 F.3d at 921.  The Circuit concluded that the plaintiffs' allegation sufficiently set out the requisite affirmative conduct necessary to support a danger creation claim because Medina's alleged conduct "interfere[d] with the protective services which would have otherwise been available" to the

-11-

children and held that the "state creates danger when it cuts off potential sources of private aid." Id. at 922. Specifically, the Circuit held that the instructions "allegedly discouraged the mother from reporting further evidence of abuse to either the police or CYF, which might then have acted to rescue the children." Id. The Circuit acknowledged that "Medina was constitutionally free to ignore the pleas of Juarez and offer no assistance, [but] her behavior allegedly discouraged Juarez from seeking the help of other CYF employees or other governmental sources of held such as the police." Id.

In this case, there is no evidence that defendant cut off potential sources of aid from the Crosettos. Defendant clearly directed the Crosettos to contact the police. The Crosettos, however, never contacted the police even though they admit that defendant could not have removed the children from the home without police intervention. (Doc. 87 at 20). Unlike the allegations in Currier, the Crosettos have not offered any evidence to support the conclusion that they were somehow discouraged from reporting additional allegations of abuse to the police or any other governmental agency even though the Crosettos were clearly frustrated with defendant and her lack of response to the situation. They contacted a doctor and the fire chief for help but argue that a call to the police would have been ignored because "the police figured once it made a report to SRS, it would investigate." (Doc. 87 at 20). The Crosettos, however, fail to cite to evidence which would support this contention.

Next, the Crosettos assert that defendant's lie that she investigated the Crosettos' concern about the living conditions at the children's home was an affirmative act. The Crosettos, however, fail

-12-

to cite any authority for their position.  In Gray v. Univ. of Colo. Hosp. Authority, 672 F.3d 909 (10th Cir. 2012), the Circuit held that the defendant's lie of promising the family twenty-four hour care was not an affirmative act even though the victim would not have died if the defendant would have followed through with the promise. Defendant's lie in this case did not result in any affirmation that the state would provide care or protection of Brook.  Moreover, there is no evidence that the lie cut off other sources of aid to the children or somehow increased the danger to Brook.

Finally, the Crosettos contend that defendant's failure to substantiate the November 5 slapping incident with Brook's brother was an affirmative act.  The Crosettos reason that the unsubstantiated finding cut off aid because it would have "had an impact on the other young children living at home."  (Doc. 87 at 10).  The Crosettos, however, have not provided any evidence or authority to support this position.  The report provided by Camie Russell does not criticize defendant for failing to find the allegations of abuse substantiated. The evidence in this case is that both defendant and Brenda Blackard staffed the allegation and determined that it was not substantiated after reviewing certain factors.  The Crosettos have not provided any evidence that Kansas law would require a substantiated finding of abuse in this instance.  In DeShaney, the social workers met as a team and determined there was insufficient evidence of child abuse.  While tragic, the Supreme Court held that the actions by the social worker in DeShaney did not arise to a violation of constitutional rights.

A failure to substantiate abuse is not an affirmative act by defendant resulting in a "duty to protect" by the state.  Robbins, 519

F.3d at 1251.  Moreover, it did not cut off any potential aid. Currier, 242 F.3d at 921.

Therefore, the court finds that the Crosettos have not established any affirmative acts by defendant, a precondition to a danger creation claim.

**B. Elements of the Danger-Creation Claim**

In order to succeed on their danger-creation claim, the Crosettos must meet all elements of the following six-part test:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

Gillen, 710 F.3d at 1173.  Defendant disputes all except element (2).

Even if the Crosettos could establish that defendant's actions were affirmative, the court nevertheless would be compelled, albeit reluctantly, to grant summary judgment in favor of defendant because the Crosettos have failed to establish element (1), that defendant created or increased the danger to Brook.  The Crosettos argue that defendant's intentional failure to act and intervene increased Brook's vulnerability and resulted in her death.  Circuit authority, however, does not provide a cause of action for a state employee's willful failure to act and rescue a plaintiff from a private actor.  As stated in Currier, a social worker is "constitutionally free to ignore the pleas of [the Crosettos] and offer no assistance."  242 F.3d at 922.

The Crosettos cite to <u>Currier</u> and <u>Briggs v. Johnson</u>, 2008 WL 1815721 (10th Cir. 2008), to support their position that the danger to Brook was increased by defendant's failure to listen to the allegations of abuse or accept the CD. <u>Currier</u> is distinguishable as there was a direct instruction by the social worker not to make any allegations of abuse which resulted in the parent being discouraged from making future allegations of abuse.

In <u>Briggs</u>, the plaintiffs alleged that two defendants instructed the grandmother to cease reporting ongoing abuse. In affirming the district court's decision to deny the defendants' motion to dismiss, the Circuit held that the allegations were sufficient to state a danger creation claim. The facts in <u>Briggs</u> are distinguishable because there was no direct instruction to the Crosettos to stop making allegations of abuse. Moreover, there is no evidence that defendant's conduct had an effect on the Crosettos' actions (or inaction).

Melissa Wells killed Brook and defendant did not place Brook in the residence with Wells. Nevertheless, the court doubts that any reasonable person not obligated to follow binding legal precedent would conclude, based on the facts presented, that defendant did not create or increase the danger to Brook. But under applicable law, it is not enough under the danger creation theory to show that a state actor may have been aware of the danger with which an individual was confronted; a plaintiff must show that the state actor played a part in the creation of the danger or rendered that individual more vulnerable to the danger. <u>DeShaney</u>, 489 U.S. at 201 ("While the State may have been aware of the dangers that Joshua faced in the free

world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.")

The court sees no reason to make individual findings regarding elements (3) through (5). At least under the facts of this case, it is difficult to parse defendant's conduct into each discrete element. Most of the Circuit's decisions don't make an element-by-element analysis, either. For purposes of this order, the court will assume that the facts, to use the Circuit's language, would be sufficient for the Crosettos to withstand summary judgment on elements (3) through (5).

A brief comment on element (6) is in order. The Crosettos assert that the Circuit concluded that defendant's conduct was conscience shocking. It apparently did, at least as far as summary judgment is concerned. When this court considered element (6) in its July 7, 2011 Memorandum and Order, it devoted many pages of analysis to the element before concluding "But bad as [the facts regarding defendant's conduct] are, they do not demonstrate conduct which can be deemed to 'shock the conscience' under [Tenth Circuit] precedent to which this court must adhere." A "shock the conscience" finding has a ring of finality which seems inappropriate for a judge to make unless he or she has all the facts. At the summary judgment stage, a court has not heard all the evidence - nor has credibility been factored in.

To make the court's position perfectly clear, however, he cannot, as a citizen and parent, understand how anyone having defendant's job could have acted as she did. Whether or not her conduct is "conscience-shocking," it is inexplicable and

unprofessional and, sadly, fairly consistent with other cases before this court involving Kansas SRS personnel.

### B. Clearly Established

When a defendant raises the defense of qualified immunity, the plaintiff must also demonstrate to the court that the law on which the plaintiff relies was clearly established at the time of the defendants' actions. See Hilliard v. City & County of Denver, 930 F.2d 1516, 1518 (10th Cir. 1991). The plaintiff must prove the right was sufficiently clear that a reasonable official would have understood that his conduct violated the right. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

The Crosettos argue, in a footnote, that the danger creation jurisprudence was clearly established by late 1994 and, therefore, the law is clearly established. (Doc. 87 at n. 3). The Crosettos, however, have to do more. In Currier, the Circuit explained that the danger creation theory as applied to social workers who place children into dangerous living situations was clearly established. However, the situation concerning the defendant Medina, the social worker in Currier who did not create the danger but affirmatively discouraged the parent from reporting abuse, was based on a different theory of danger creation and therefore, the plaintiffs were required to show that it was clearly established. 242 F.3d at 924-25. Ultimately, the

-17-

Circuit held that the allegations concerning Medina were not clearly established.

Notwithstanding the court's decision that the Crosettos have not met their burden to show that Brook's rights were violated, the Crosettos have not established that the theory of danger creation in this case was clearly established at the times alleged in the complaint. The Crosettos essentially assert that an intentional refusal to act and accept evidence enhanced the danger to Brook and made her more vulnerable to Wells' abuse. The Crosettos cite to Currier for the proposition that the alleged violation was clearly established. (Doc. 87 at n. 3). The Currier case holds that a social worker can be found to have created the danger of private abuse when she gives an affirmative instruction to not report abuse. This case, however, is distinguishable. There was no affirmative instruction not to report abuse. The instruction was to report the abuse to the police. Moreover, there is no evidence that defendant would somehow prevent the police from acting if and when the Crosettos made a report to the police.

As stated in Currier, a social worker is "constitutionally free to ignore the pleas of [a reporter of abuse] and offer no assistance." 242 F.3d at 922. While the allegations in this case suggest that defendant may have had animus towards the Crosettos, there is no evidence that defendant intended to harm Brook nor is there authority holding that an intentional refusal to act results in a finding that the social worker enhanced the danger to a plaintiff from a private actor.

Thus, defendant is entitled to qualified immunity.

**IV.  CONCLUSION**[9]

Defendant's motion for summary judgment is granted.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in Comeau. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this 12th day of September 2013, at Wichita, Kansas.

                                s/ Monti Belot
                                Monti L. Belot
                                UNITED STATES DISTRICT JUDGE

---

[9] The Crosettos' motion for a hearing is denied. (Doc. 89).